# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KRISTOFFER MORRIS,**              **CASE NO. 2:08-cv-1176**
                                    **JUDGE GRAHAM**
         **Petitioner,**            **MAGISTRATE JUDGE ABEL**

**v.**

**PHILIP KERNS, Warden,**

         **Respondent.**

## <u>ORDER and</u>
## <u>REPORT AND RECOMMENDATION</u>

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus

pursuant to 28 U.S.C. §2254.  This matter is before the Court on the instant petition,

respondent's return of writ, petitioner's motion and supplemental motion for a stay,

respondent's opposition, and the exhibits of the parties.

This action involves petitioner's convictions after a jury trial in the Franklin

County Court of Common Pleas on aggravated murder, murder, involuntary man-

slaughter, aggravated burglary, and related charges arising from a shooting which

resulted in the death of Clifford Shortridge Jr., and Russell Bonner, and injury to

Clifford Shortridge Sr.  The trial court sentenced petitioner to an aggregate term of 66

years to life imprisonment.  The Ohio Tenth District Court of Appeals affirmed peti-

tioner's convictions and sentence, and the Ohio Supreme Court dismissed petitioner's

appeal.  Petitioner now asserts in these habeas corpus proceedings that the evidence

was constitutionally insufficient to sustain his convictions and that his convictions are

against the manifest weight of the evidence; that his sentence violates *Blakely v. Washington*, 542 U.S. 296 (2004); and that he was denied a fair trial based on jury instructions issued regarding his flight.

For the reasons that follow, the Magistrate Judge **RECOMMENDS** that petitioner's motion for a stay be **DENIED** and that the petition for writ of habeas corpus be **DISMISSED.**

Petitioner's motion to compel a ruling on his request for a stay, Doc. No. 10, is **DENIED,** as moot. Petitioner's motion to strike, Doc. No. 11, is **DENIED**.

## MOTION TO STRIKE

Petitioner has filed a motion to strike respondent's Return of Writ because respondent filed the Return of Writ while petitioner's request for a stay was pending, and because it took respondent sixty days to file a response. *See* Doc. No. 11. Petitioner also complains that respondent did not provide petitioner with a copy of the trial transcripts, and contends that the Return of Writ therefore must be stricken from the record under Rule 5 of the Federal Rules of Civil Procedure.[1] *See id.; Reply to Response in Opposition*, Doc. No.

---

[1] Rule 5 of the Federal Rules of Civil Procedure provides:

Serving and Filing Pleadings and Other Papers

(a) Service: When Required.
(1) In General. Unless these rules provide otherwise, each of the following papers must be served on every party:

(A) an order stating that service is required;

(B) a pleading filed after the original complaint, unless the court orders

otherwise under Rule 5(c) because there are numerous defendants;

(C) a discovery paper required to be served on a party, unless the court orders otherwise;

(D) a written motion, except one that may be heard ex parte; and

(E) a written notice, appearance, demand, or offer of judgment, or any similar paper.

(2) *If a Party Fails to Appear.* No service is required on a party who is in default for failing to appear. But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4.

(3) *Seizing Property.* If an action is begun by seizing property and no person is or need be named as a defendant, any service required before the filing of an appearance, answer, or claim must be made on the person who had custody or possession of the property when it was seized.

(b) Service: How Made.

(1) *Serving an Attorney.* If a party is represented by an attorney, service under this rule must be made on the attorney unless the court orders service on the party.

(2) *Service in General.* A paper is served under this rule by:

(A) handing it to the person;

(B) leaving it:

(I) at the person's office with a clerk or other person in charge or, if no one is in charge, in a conspicuous place in the office; or

(ii) if the person has no office or the office is closed, at the person's dwelling or usual place of abode with someone of suitable age and discretion who resides there;

(C) mailing it to the person's last known address--in which event service is complete upon mailing;

(D) leaving it with the court clerk if the person has no known address;

(E) sending it by electronic means if the person consented in writing--in which event service is complete upon transmission, but is not effective if the serving party learns that it did not reach the person to be served; or

(F) delivering it by any other means that the person consented to in writing--in which event service is complete when the person making service delivers it to the agency designated to make delivery.

(3) *Using Court Facilities.* If a local rule so authorizes, a party may use the court's transmission facilities to make service under Rule 5(b)(2)(E).

(c) Serving Numerous Defendants.

(1) *In General.* If an action involves an unusually large number of defendants, the court may, on motion or on its own, order that:

(A) defendants' pleadings and replies to them need not be served on other defendants;

(B) any crossclaim, counterclaim, avoidance, or affirmative defense in those pleadings and replies to them will be treated as denied or avoided by all other parties; and

(C) filing any such pleading and serving it on the plaintiff constitutes notice of the pleading to all parties.

(2) *Notifying Parties.* A copy of every such order must be served on the parties as the court directs.

(d) Filing.

(1) *Required Filings; Certificate of Service.* Any paper after the complaint that is required to be served--together with a certificate of service--must be filed within a reasonable time after service. But disclosures under Rule 26(a)(1) or (2) and the following discovery requests and responses must not be filed until they are used in the proceeding or the court orders filing: depositions, interrogatories, requests for documents or tangible things or

13.  Petitioner's arguments are not persuasive.

This Court granted respondent's request for an extension of time until March 16, 2009, to file a response to the petition.  Respondent thereafter timely filed the Return of Writ on March 13, 2009, after filing, on February 4, 2009, a response to petitioner's January 21, 2009, motion for a stay.   *See* Doc. Nos. 3-6, 8.

Additionally, the record reflects that respondent complied with Rule 5(c) of the Rules Governing Section 2254 Cases in the United States District Courts, by filing a copy of the state court transcripts in this case.  Rule 5(c) of the Rules Governing Section 2254 Cases in the United States District Courts provides:

(c) Contents: Transcripts. The answer must also indicate

---

to permit entry onto land, and requests for admission.

(2) *How Filing Is Made--In General.* A paper is filed by delivering it:

(A) to the clerk; or

(B) to a judge who agrees to accept it for filing, and who must then note the filing date on the paper and promptly send it to the clerk.

(3) *Electronic Filing, Signing, or Verification.* A court may, by local rule, allow papers to be filed, signed, or verified by electronic means that are consistent with any technical standards established by the Judicial Conference of the United States. A local rule may require electronic filing only if reasonable exceptions are allowed. A paper filed electronically in compliance with a local rule is a written paper for purposes of these rules.

(4) *Acceptance by the Clerk.* The clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice.

what transcripts (of pretrial, trial, sentencing, or post-conviction proceedings) are available, when they can be furnished, and what proceedings have been recorded but not transcribed. The respondent must attach to the answer parts of the transcript that the respondent considers relevant. The judge may order that the respondent furnish other parts of existing transcripts or that parts of untranscribed recordings be transcribed and furnished. If a transcript cannot be obtained, the respondent may submit a narrative summary of the evidence.

The fact that respondent filed the Return of Writ while petitioner's motion for a stay remained pending before this Court, pursuant to this Court's scheduling order, *see* Doc. No. 2, does provide grounds to strike the Return of Writ. Additionally, and

> [c]ontrary to Petitioner's view, Rule 5 of the Rules Governing Section 2254 Cases does not entitle him to a free copy of the entire state court record; it requires only that the respondent provide certain documents, including "parts of the transcript that the respondent considers relevant." See Rules Governing Section 2254 Cases, Rule 5(c).

*Bonomelli v. Dinwiddie*, 2008 WL 5059814 (W.D. Okla., November 21, 2008).

> As... *Thompson [v. Greene*, 427 F.3d 263, 268-69 (4th Cir. 2005),] noted... the rules governing federal habeas proceedings do not explicitly require service of the exhibits. *See* Rule 5, Rules Governing Section 2254 Cases (2006).
>
> ***
>
> Rule 11, Rules Governing Section 2254 Cases (2006), [ which is] permissive rather than mandatory, provides that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or [the Habeas Rules], may be applied to a proceeding under these rules" (emphasis added). Likewise, Rule 81(a)(2), Fed. R. Civ. P., provides, in pertinent part, that the Federal Rules of Civil Procedure "are applicable to proceedings for admission

to citizenship, habeas corpus, and quo warranto, to the extent that the practice in such proceedings is not set forth in statutes of the United States, the Rules Governing Section 2254 Cases, or the Rules Governing Section 2255 Proceedings." Fed.R.Civ.P. 81(a)(2). Congress has addressed circumstances under which the clerk may provide copies of documents from the record to a petitioner without cost in a federal habeas proceeding:

> If on any application for a writ of habeas corpus an order has been made permitting the petitioner to prosecute the application in forma pauperis, the clerk of any court of the United States shall furnish to the petitioner without cost certified copies of such documents or parts of the record on file in his office as may be required by order of the judge before whom the application is pending.

> 28 U.S.C. § 2250 (2006). In the instant case, Petitioner has not sought or been granted leave to proceed in forma pauperis in this Court.

> ... [T]he documents Petitioner seeks are state court records Respondent was required to file with the Court under Rule 5(d), Rules Governing Section 2254 Cases (2006). Petitioner has not demonstrated that he has made any effort to obtain copies of these documents from the state court. Moreover... [h]aving prosecuted a direct appeal, Petitioner should have a copy of the state court record.

*Webster v. McDonough*, 2006 WL 2947859 (M.D. Fla., October 16, 2006). Petitioner has attached portions of his state trial transcripts to his supplemental motion for a stay, *see Exhibits to Doc. No. 9*, and the record therefore indicates that petitioner has access to a copy of his transcripts in this case.

Therefore, petitioner's motion to strike the Return of Writ, Doc. No. 11, is **DENIED**.

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural

history of this case as follows:

> This case arises from shootings, which occurred on July 12, 2004, in Franklin County, Ohio, that resulted in the death of Clifford Shortridge, Jr., and Russell Bonner, and the wounding of Clifford Shortridge, Sr. On July 22, 2004, the Franklin County Grand Jury indicted defendant on 22 counts, and defendant was ultimately tried on the following 12 renumbered counts: one count of aggravated burglary (count one); four counts of aggravated murder, all with death penalty specifications (counts two, three, four, and five); three counts of attempted murder (counts six, seven, and nine); two counts of felonious assault (counts eight and ten); and two counts of having weapon under disability (counts 17 and 22). Counts one through ten contained firearm specifications. The jury trial commenced on August 8, 2005.

> Glenna Shortridge ("Glenna"), the mother of Clifford Shortridge, Jr. ("Clifford, Jr."), and the wife of Clifford Shortridge, Sr. ("Clifford, Sr."), testified at trial as follows. On July 12, 2004, Glenna, Clifford, Sr., Clifford, Jr., her four other children, and a family friend, Russell Bonner ("Bonner"), were living at 1324 Brown Road in Franklin County, Ohio. Glenna testified that she had previously met defendant when he worked as a spot laborer for her husband's tree and landscaping company. Glenna denied that drugs were ever sold at her house or that stolen items were delivered to her house. Glenna saw defendant at her house at approximately 10 p.m., on July 11, 2004, talking to her husband. Defendant and another man entered the house and sat at the dining room table with Clifford Sr., where they ate some food prepared by Glenna. After approximately ten or 15 minutes, and no later than 11 p.m., defendant and the other man left the house.

> Approximately two and one-half hours later, and while she

and others were sitting on her front porch, Glenna saw a "tall, thin gentleman" walking northbound on Brown Road. (Tr. 200-201.) The tall, thin man crossed over in front of Glenna's house, and someone said, "Come on, Kris." (Tr. 203.) The man entered a vehicle and left the area. Minutes later, one of Glenna's dogs started to growl. Glenna's daughter, Raynae, walked around the corner of the house to investigate why the dog was growling. Raynae returned to the well-lit front porch screaming, "Oh, my God, Mom. Here comes guys, and they have guns." (Tr. 216.) Glenna saw defendant and another man run up onto the porch. Bonner, who had been sitting on the porch with Glenna and others, ran into the house. Once on the porch, defendant stated, "What's up, motherfuckers." (Tr. 220.) Defendant pointed his gun at the persons on the porch. Glenna recalled one or two shots being fired before defendant and the other man arrived on the porch. Defendant entered the house, with the other man following him. Glenna ran in behind them, and grabbed her 13-year-old autistic, hearing-impaired son by the shirt and forced him out of the house. She turned around and saw Bonner being shot by defendant. The "shorter, chubbier" intruder was "froze," and Glenna "didn't see him doing anything." (Tr. 229.) Glenna testified that the shorter intruder's hands were to his side. Glenna ran out of the house and vomited. As she ran toward the back of the house, she heard gunshots coming from inside the house.

Glenna went back into the house and found Bonner lying on the dining room floor. Glenna tried to attend to Bonner, but she realized there was nothing she could do to save him. Glenna screamed for her kids and then she saw Clifford, Sr., in the hallway. He had blood coming out of both sides of his chest, and Glenna "told him to put his fingers in his holes" to stop the bleeding. (Tr. 242.) Glenna heard her two-year-old son screaming from the end of the hallway, and she went in that direction. She then found her son, Clifford, Jr., lying in the hallway. She screamed for help, and when the EMTs arrived, they determined that he was deceased.

Glenna testified that she began to correspond with inmate, and convicted murderer, Martin Scott ("Scott"), in the

months after the shootings, when she was trying to determine whether defendant should receive a death sentence or life in prison. Scott and Glenna developed a "pen-pal type * * * affair." (Tr. 305.) At the time, Glenna was drinking heavily and she felt that her marriage was over and her life was "destroyed." (Tr. 305.) The letters that Scott sent to her provided her with emotional support. Glenna denied that she had attempted to hire Scott to kill defendant if defendant was sent to prison for life and not given a death sentence. In December 2004, Clifford, Sr., learned of the relationship and filed for divorce. Glenna told Scott that the relationship had to stop because she did not want to lose her husband. Scott began sending threatening letters to Glenna. Scott had referred to Glenna "as his ticket to freedom." (Tr. 314.)

Clifford, Sr., testified at trial as follows. Defendant had worked for Clifford, Sr., as a spot laborer for his landscaping business. Approximately one week before the shootings, defendant purchased drugs from him. In another transaction, defendant sold what appeared to be stolen motorcycles to Bonner, who purchased the motorcycles with the aid of money loaned from Clifford, Sr. When the money for the motorcycles was exchanged, defendant saw the large amount of money Clifford, Sr., had in his possession. At one of the transactions, Clifford, Sr., demanded that defendant lift his shirt so Clifford, Sr., could see whether he was wired or undercover. Clifford, Sr., noticed a "distinctive tattoo" on defendant's stomach. (Tr. 345.)

Clifford, Sr., testified that, on the evening of July 11, 2004, defendant and Paul Speakman ("Speakman"), who Clifford, Sr., had previously met, arrived at his house. The three sat at the table and ate a meal, and defendant and Speakman offered to sell Clifford, Sr., some commercial lawnmowers. Clifford, Sr. rejected the offer. After Clifford, Sr., indicated his disinterest in the lawnmowers, defendant and Speakman left the house. Clifford, Sr., went to bed at approximately 11 p.m. and awakened at approximately 1 a.m. and asked Glenna to get a Pepsi for him. Clifford, Sr., went back to sleep, but was awakened by gunfire. He opened the bedroom door, heard a loud bang, and saw defendant shooting to the east of

the house, down the hallway. Clifford, Sr., testified that he said, "What the fuck are you shooting at, motherfucker?" (Tr. 365.) According to Clifford, Sr., defendant replied, "And I got one for you, too." (Tr. 368.) Defendant lifted his shirt to conceal his face, and Clifford, Sr., noticed the tattoo that he had previously seen on defendant. Defendant shot Clifford, Sr., as Clifford, Sr., was turning to go back into the bedroom. The bullet that struck Clifford, Sr., went through him and into the closet. After he was shot, Clifford, Sr., fell on the bed and said, "You killed me. You got me, motherfucker. You got me." (Tr. 373-374.) He heard someone screaming, "Come on, Kris. Come on, Kris. Let's get the fuck out of here, Kris. Let's get the fuck out of here, Kris." (Tr. 375.) Clifford, Sr., did not see Speakman at the time of the shootings. Clifford, Sr., took two guns and went out to the front porch and then the police arrived to secure the scene.

Jason Littler ("Littler"), a neighbor of the Shortridges on Brown Road, testified that, approximately between 2 and 3 a.m. on July 12, 2004, he saw two males, with something over their faces, quickly approach the front porch of the Shortridge house. He then heard, "What's up, mother-fucker." (Tr. 1099.) After that statement, he heard Raynae and Glenna screaming. Within a few seconds he heard gunfire. According to Littler's testimony, he heard a couple gunshots, then a "bunch." (Tr. 1101.) After the initial gun-shots, he heard "big Cliff" say "You got me[.]" *Id* . At that point in time, Littler went into his house and called 911. Littler testified that the gunshots initially sounded like they were coming from the front of the Shortridge house, and then the final shots sounded like they were coming from the back of the house.

Corporal William Cox of the Franklin County Sheriff's Office arrived at 1324 Brown Road within a few minutes after the shootings. Glenna directed Corporal Cox to her house. After entering the house, Corporal Cox found the victims, who were motionless, but he did not see any assailant. He asked Glenna if she knew who committed the crimes, and she responded, "Kris Morris." (Tr. 535.)

Special Agent Douglas Caplinger of the Ohio Bureau of Criminal Identification and Investigation ("BCI"), arrived at the scene of the shootings at approximately 5:20 am, on July 12, 2004. Agent Caplinger observed two bodies at the scene, and he photographed the scene. In processing the scene, Agent Caplinger recovered multiple bullet fragments and spent casings. Specifically, he recovered one spent casing outside the house at the corner of Little Avenue and Brown Road. Inside the house, he recovered three live cartridges, nine spent casings, and five spent bullets and bullet fragments. Agent Caplinger also processed two vehicles in connection with the investigation: a 1999 Nissan Altima, which belonged to Kimberly Repede ("Kimberly"), and a 1997 Chrysler Sebring, which belonged to Staci Gilcrest ("Staci"). He found an unloaded magazine for a 9-millimeter pistol in the trunk of the Chrysler and two live cartridges in the floorboard area of the driver's side of the Nissan.

Kimberly, who was with defendant on the night of the homicides, testified at trial as follows. She met defendant during Memorial Day weekend in 2004, and the two were dating as of July 11, 2004. She was with defendant when he sold stolen dirt bikes to Clifford, Sr., for money and drugs. She identified the 1999 Nissan Altima as her vehicle. On July 11, 2004, Kimberly, defendant, and Erica Smith ("Erica") met at Kimberly's house in Dublin, and they made plans to go to a bar and drink. They left the house in Kimberly's Altima and went to pick up Speakman at his house in Grove City. After picking up Speakman, they drove to the Shortridge house to buy Xanax. Upon arrival, defendant and Speakman went into the Shortridge house for approximately five to ten minutes. Kimberly and Erica stayed in the vehicle.

They proceeded to go to the "Front Row Tavern" in Grove City, where they drank and played pool. Kimberly took Xanax that defendant gave her. According to Kimberly, defendant and Speakman were also taking Xanax, but Erica was not taking the drug. Kimberly and defendant got into an argument and defendant punched her in the mouth. Kimberly described defendant as being "very hyped up and drunk and high" at that point in time. (Tr. 617.) After

defendant punched Kimberly, they got into her vehicle and defendant drove to a church parking lot on Brown Road, which is across the street from the Shortridge house. Defendant parked the vehicle so its front end was facing the street.

After parking, defendant got out of the vehicle. Erica and Staci arrived with Speakman, and Speakman got out and started to talk with defendant. Defendant told Kimberly to get into the driver's seat and keep the vehicle on. Kimberly observed defendant and Speakman put on defendant's clothes from the trunk of her vehicle, and she saw defendant and Speakman place guns in their pants and run across the street. Subsequently, she heard approximately ten to 13 gunshots, and within seconds she saw defendant and Speakman running back to the vehicles. Defendant got into Kimberly's vehicle and said, "Go." (Tr. 629.)

They left the church parking lot, headed south, and arrived at "Collier Park." At Collier Park, defendant and Speakman got out of the vehicles, and defendant, who still had his gun, "fired shots" and talked about how he "wanted to go out and do more." (Tr. 630.) Defendant got back into the vehicle with Kimberly and, at some point, the two looked for a gun that defendant had thrown out the window. Defendant dropped Kimberly off at her house and went back out with her vehicle.

Later that day, Kimberly went to classes at Columbus State. After the classes, she was surrounded by police officers. She agreed to help the police find the gun, and they searched different areas for the gun. When she was with the police, defendant called her cell phone multiple times, and she put defendant on speakerphone so Detectives McDowell and McMillin could hear him. One of the calls was recorded. The recording of the call was played at trial. On the recording, defendant and Speakman attempted to direct Kimberly to their location. At one point, defendant asked her where she was located, and she responded that she did not know the name of the apartments. Defendant told her to go look at the sign, and she responded, "[t]here was no sign." Defendant then stated, "I bet they're watching those entrances." (Tr.

643.)

Staci Gilcrest testified at trial as follows. On July 11, 2004, Staci went to the Front Row bar to meet her friend, Erica Smith, who was at the bar with defendant, Kimberly, and Speakman. She admitted that she took Xanax and drank at the Front Row bar that evening. At some point in time, Staci, Erica, defendant, Kimberly, and Speakman, left the bar in Staci and Kimberly's vehicles. She recalled the group parking the vehicles in a church parking lot, and she was "feeling a little woozy" at the time. (Tr. 695.) When they stopped, Speakman was looking through Erica's clothing in the back seat for a long-sleeved shirt. Staci saw defendant and Speakman going through the trunk of Kimberly's vehicle, and then she passed out for a period of time. After that, she heard loud noises and then defendant and Speakman "running from across the street." (Tr. 700.) She remembered going to Collier Park, where Speakman "shove [d] pills down [her] throat." (Tr. 702 .)

Erica Smith testified that when she, Kimberly, and defendant were talking about what they were going to do that evening, and defendant joked that "[s]ome shit's going to go down tonight. How do you all feel about moving to Mexico?" (Tr. 719.) According to Erica, they laughed at that statement. After they left the apartment in Kimberly's vehicle to pick up Speakman, defendant called Clifford, Sr., and stated, "I'm coming to pick up some pills. Those pills you gave me the other day weren't what you said they were. I want some Xanax." (Tr. 722.) Erica testified that a couple days before July 11, 2004, defendant had indicated to her that he wanted to "set up" Clifford, Sr., in order to rob him. (Tr. 724-725.)

When they arrived at the Shortridge house, defendant and Speakman went inside for a few minutes and returned with Xanax. They proceeded to go to the Front Row bar. Erica saw defendant and Kimberly get into a fight and she saw defendant bite Kimberly's lip and punch her in the face. Defendant walked around the shopping center near the bar and retrieved his gun out of Kimberly's vehicle. Defendant approached Kimberly's vehicle and said to Erica, "You're

fucking taking me to that house. I'm going to go fucking rob that dude." (Tr. 737.) Erica refused. Defendant told her to get in the backseat because he was going to drive and pointed the gun at her. Erica got out of the vehicle and went to Staci's vehicle, and they drove to the area of the Shortridge house.

Erica saw defendant walking down the street with a brown or tan bandanna on his face and a gun in his hand. Speakman got out of Staci's vehicle and talked with defendant. Speakman got back into Staci's vehicle, and they parked the vehicle in a church parking lot near Kimberly's vehicle. After they parked, Speakman got out of the vehicle and spoke with defendant. Staci, Erica, and Kimberly remained in the vehicles. Both defendant and Speakman had a gun. Erica indicated to Speakman that she and Staci wanted to leave. He responded, "You motherfuckers aren't going nowhere," and he pointed the gun at the vehicle. (Tr. 753.) Defendant and Speakman then ran through the bushes, and approximately one minute and 30 seconds later Erica heard 10 to 14 shots fired. "Almost immediately" after the gunfire stopped, Erica saw defendant and Speakman running. (Tr. 754.)

The two men got back into the vehicles and the group drove to Collier Park, which is an apartment complex, and defendant said "he wanted to go rob some Mexicans that lived there." (Tr. 756-757.) Speakman indicated to defendant that they did not have enough bullets, and defendant responded, "We'll make the girls go buy some more." (Tr. 757.) Defendant fired his gun one time at Collier Park.

Johnetta Jessee ("Johnetta"), who resided at the Wind Rush apartment complex, testified at trial as follows. Johnetta knew Speakman because she had lived near his father, and she also knew defendant. On July 12, 2004, defendant and Speakman arrived at her apartment at the Wind Rush complex. According to Johnetta, defendant was "[a]ntsy, nervous, hyper, loud," and he had two handguns. (Tr. 1116.) Johnetta testified that defendant said "he done killed down on Brown Road, that he would-them MF-ers on Brown Road. He would kill me. Now, be quiet." (Tr. 1117.) Defendant showed her a fake passport ID and indicated to her that they

15

were waiting to get Speakman's before they could leave the country. Defendant called Speakman to ask for a bulletproof vest. Defendant stated that he wanted to go rob two more places. Defendant and Speakman left the apartment, and shortly thereafter Johnetta heard gunshots.

Lieutenant Michael Spiert, of the Franklin County Sheriff's Office, testified at trial. On July 12, 2004, Lieutenant Spiert, who was working special duty and was in plain clothes, was directed to go to the Central Point Shopping Center. Upon arrival, he was told to search for two suspects, who were dressed in black, at the Wind Rush apartment complex. He drove, in an unmarked vehicle, through the apartment complex, and as he exited the complex, he saw two individuals dressed in black crouched behind a wall. Trying not to be noticed, Lieutenant Spiert continued out of the complex and pulled into a business parking lot and radioed that he had seen the suspects. An arrest team was assembled. At some point, instructions were given to move in and apprehend the suspects. As Lieutenant Spiert proceeded to the north entrance of the apartment complex, he heard a gunshot. Detective McMillin radioed that he was being shot at. Lieutenant Spiert followed one of the detectives toward the back of the apartment complex, where he saw an article of clothing hanging from a large fence and a handgun in the grass near the fence. He radioed for assistance in setting up a perimeter around a wooded area near the fence. He then heard a gunshot nearby. Shortly thereafter, Speakman was found dead, from a self-inflicted gunshot wound, in a patio area of an apartment. Columbus Police Officer Eric Everett testified that defendant was apprehended near a creek bed approximately one mile from the Wind Rush apartments.

After the shootings at the Shortridge house, but before defendant's apprehension, Detectives Robert McMillin and Larry McDowell, both of the Franklin County Sheriff's Office, were directed to take Kimberly to the area of Brown Road to search for a handgun. As they were searching, Kimberly received a phone call from defendant. Kimberly placed the call on speakerphone to enable the detectives to hear defendant. Detective McMillin testified that defendant

"threatened if she brought the cops to him, that he would kill her and kill her entire fucking family as well as he'd already killed two other motherfuckers, and he could do more." (Tr. 932.) Detective McMillin added, "It's not direct quotes, but words to that effect." Id. Detective McDowell also testified that defendant indicated that he would kill Kimberly and her family if she was with the police, and that defendant stated, "I've already killed two motherfuckers, and I'll kill more." (Tr. 989.) During another phone call, which Kimberly also placed on speakerphone, Kimberly asked defendant where the handgun that he had used was located, and, according to Detective McMillin, defendant responded, "Don't worry about it. I've got the fucking gun." (Tr. 936.) Defendant made more threats to Kimberly and indicated that they were waiting for her at the Wind Rush apartments.

Detectives McMillin and McDowell arrived at Central Point Shopping Center with Kimberly and were informed of the plan to apprehend the suspects. The detectives left Kimberly at that location with other officers, and proceeded to an area near the Wind Rush apartments. At some point, the detectives were directed to go into the apartment complex. After they turned into the complex, with their vehicle headlights off, they saw a white male, who was wearing black clothing, walk toward them waving his arms and whistling at the vehicle. Detective McDowell turned on the lights and they recognized defendant from photographs they earlier had reviewed. The detectives confronted him at gunpoint and told him to freeze and lift his hands. Initially, defendant complied by lifting his hands. However, he then dropped his hands and fled. Detective McMillin pursued him by foot.

Detective McMillin testified that, shortly after the foot pursuit began, there was "a gunshot fired at us by Mr. Morris." (Tr. 946.) Detective McMillin further testified:

When we first made contact with him, I did not see any weapons. When he was running, fleeing from us, and we initially start to pursue, the shot is fired in a manner like this at us. He didn't stop, take aim or anything. He was running,

hanging the handgun back over behind him and fire. I saw a muzzle flash from the weapon.

(Tr. 946.) The prosecutor then asked the following question: "So as you say, he doesn't stop; but he turns while he's running and fires a shot?" *Id.* Detective McMillin answered, "Yeah, he's basically running away from us, but turns in that direction. You know, we're pursuing, coming up this way. He turns back, and I see a muzzle flash from a weapon." *Id.* At the time he fired the shot, defendant was "running at a high rate of speed." (Tr. 959.) On cross-examination, Detective McMillin further testified regarding the gunshot that occurred when defendant was fleeing:

Q. Now, I believe you testified that when you began your pursuit, there was a shot fired, and I think you made some kind of motion like turning over the shoulder?

A. And firing, right. There was-there was-there wasn't a aimed shot at us. As he was fleeing at a high rate of speed, there was a shot fired in that manner.

Q. Okay. And I believe your exact words were: "He never took aim"; is that accurate?

A. Yeah. In saying that, I'm a firearms instructor. Not taking a shooting position, trying to aim at-

Q. A target.

A.-target, Detective McDowell. That's what I meant when I said a shooting position.

(Tr. 974.) Detective McDowell's testimony indicated that defendant fired the weapon over his shoulder as the detectives were pursuing him.

After the shot was fired, the detectives continued to pursue defendant. The detectives lost sight of defendant when he ran around the corner of an apartment building. They searched the area and then heard a gunshot. They found

Speakman dead with a gun in his hand and another in his waistband.

Special Agent William Hatfield of BCI processed the scene at the Wind Rush apartments. At the apartment complex, agent Hatfield recovered a "Jennings Bryco" 9-millimeter semi-automatic pistol on the ground between apartment buildings, a "Taurus" .357 Magnum revolver as well as a "Ruger" semiautomatic 9-millimeter pistol near the body of Speakman, and a "Glock" 9-millimeter semiautomatic pistol near the stockade fence.

William Mark, a firearms examiner with the BCI, testified that the four weapons that were submitted for examination were found to be in proper working order. He opined that ten spent cartridge cases and four bullets recovered by Agent Caplinger from inside the Shortridge house and from the corner of Brown Road and Little Avenue were fired from the Ruger semiautomatic pistol, which was recovered at the Wind Rush apartments. He also opined that one spent cartridge case recovered inside the Shortridge house was fired from the Glock pistol, which was recovered at the Wind Rush apartments.

Patrick Fardal, M.D., testified regarding the autopsies performed on Russell Bonner and Clifford Shortridge, Jr. Dr. Fardal testified that he found six entrance gunshot wounds on Bonner's body. He further testified that Bonner suffered injury to multiple internal organs, including his left lung, abdominal aorta, his liver, his left kidney, and his small bowel, which caused him to bleed to death. Dr. Fardal testified that one gunshot entrance wound and one exit wound was found on the body of Clifford Jr. Dr. Fardal testified that Clifford, Jr. died as a result of a single gunshot wound, with injuries to his lungs and aorta, which caused him to bleed to death.

At trial, the parties stipulated that defendant had certain items on his person at the time of his arrest, including a knife, four live 9-millimeter bullets, a brown bandanna, a pair of black gloves, and a black wallet containing different

identification cards. In addition, the parties stipulated that defendant was inside the Shortridge house at 1324 Brown Road at the time of the shooting, and that defendant did have a "distinctive tattoo" on his stomach as testified to by Clifford Shortridge, Sr. (Tr. 1203.)

Martin Scott was called as a witness on behalf of defendant. Scott testified that he is currently serving a 53-years-to-life prison sentence in Lucasville for murder. Scott became acquainted with Glenna Shortridge in late July or early August 2004, when she wrote a letter to him. Scott testified that Clifford, Sr., provided him with a synopsis as to what had occurred, and Scott offered to kill defendant in exchange for money and that Clifford, Sr., accepted the offer. Scott testified that Clifford, Sr., told him the following in a telephone conversation: "Listen, I'm going to be honest with you. * * * I didn't see Kris shoot anyone. Paul did it. But since that bitch killed himself, I'm going to blame it all on Kris." (Tr. 1219.) Scott admitted to sending hundreds of letters to Glenna. Scott testified that, after Clifford, Sr., learned of Glenna's pen-pal relationship with Scott, Scott informed Clifford, Sr., that the deal to kill defendant was off the table. Scott testified that after Glenna ended their pen-pal relationship, he sent more mail to her, which was sent back to prison with the notation, "Return to sender." (Tr. 1228.)

At the conclusion of the trial, the trial court gave its instruction to the jury, which included an instruction on the issue of flight. The defense objected to the instruction given to the jury regarding defendant's flight.

The jury returned the following verdicts: as to count one, guilty of aggravated burglary, with a firearm specification; as to count two, not guilty of aggravated murder as charged, but guilty of the lesser-included offense of murder, with a firearm specification; as to count three, guilty of aggravated murder, with a firearm specification; as to count four, not guilty of aggravated murder as charged, but guilty of the lesser included offense of involuntary manslaughter, with a firearm specification; as to count five, not guilty of aggravated murder, but guilty of the lesser-included offense of invol-

untary manslaughter, with a firearm specification; as to count six, guilty of attempted murder, with a firearm specification; as to count seven, not guilty of attempted murder; as to count eight, guilty of felonious assault, with a firearm specification; as to count nine, not guilty of attempted murder; and as to count ten, guilty of felonious assault, with a firearm specification. In addition, as to count three, the jury found that defendant did not personally commit each act which constituted the aggravated murder, including firing the shot that caused the death of Russell Bonner, or commit the aggravated murder with prior calculation and design. Also as to count three, the jury found that the aggravated murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the defendant. The trial court found defendant guilty of two counts of having a weapon under disability (counts 17 and 22).

A mitigation hearing began on August 22, 2005. On August 23, 2005, the jury determined that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt and recommended a prison sentence of 30 years to life.

The trial court filed its judgment entry of conviction and sentence on August 25, 2005, and an amended entry on September 14, 2005. By said entry, the trial court imposed the following sentence: 30 years to life as to count three, ten years as to count one, ten years as to count four, ten years as to count six with an additional three years for the use of the firearm, ten years as to count eight, ten years as to count ten with an additional three years for the use of a firearm, three years as to count 17, and three years as to count 22. The trial court merged the firearm specifications in counts one through six for purposes of sentencing, merged counts two and three as well as four and five for sentencing purposes, ordered that counts one, ten, 17 and 22 are to run concurrent with each other and all other counts, and ordered that counts three, four, six, and eight are to run consecutive to each other and the two firearm specifications. Therefore, the trial court imposed upon defendant a total prison sentence of 66 years

to life.

*State v. Morris*, 2007 WL 1447850 (Ohio App. 10th Dist. May 17, 2007). Represented by

new counsel, petitioner filed a timely appeal.  He asserted the following assignments of

error:

> 1.  Appellant's convictions were not supported by sufficient
> evidence and were against the manifest weight of the evid-
> ence.

> 2.  The trial court commits reversible error for giving maxi-
> mum consecutive sentences when there were no facts prov-
> en beyond a reasonable doubt to the jury to support giving
> non-minimum, consecutive sentences.

> 3.  The trial court commits reversible error when it gives a
> jury instruction that violates the defendant's right to remain
> silent under the state and federal constitutions.

*See id.*  On May 17, 2007, the appellate court affirmed the judgment of the trial court.  *Id.*

On October 3, 2007, the Ohio Supreme Court dismissed petitioner's subsequent appeal.

*State v. Morris,* 115 Ohio St.3d 1423 (2007).

On December 15, 2008, petitioner filed the instant *pro se* petition for a writ of

habeas corpus pursuant to 28 U.S.C. §2254.  He alleges that he is in the custody of the

respondent in violation of the Constitution of the United States based upon the

following grounds:

> 1.  With respect to the aggravated murder and felonious
> assault convictions, they were against the sufficiency of the
> evidence.  The convictions for murder, aggravated murder
> and attempted murder are against the manifest weight of the
> evidence.

2. Petitioner was sentenced to incarceration that was the product of judicial factfinding on issues not submitted to or considered by the jury that convicted petitioner.

3. The trial court gave a jury instruction on flight that shifted the burden to petitioner to explain the flight, otherwise; guilt could be inferred from the flight. This violated petitioner's 5th and 14th amendment right not to testify.

On January 21, 2009, petitioner filed a motion to stay proceedings pending his exhaustion of his claim of ineffective assistance of appellate counsel in the state courts. Doc. No. 5. Petitioner indicates that, upon exhausting state court remedies, he will file a request to amend his petition to include a claim of ineffective assistance of appellate counsel. *See id.* Respondent opposes petitioner's request. Doc. No. 6. On February 27, 2009, petitioner apparently filed a delayed application to reopen the appeal pursuant to Ohio Appellate Rule 26(B) in the state courts. *See Supplement to Motion to Stay*, Doc. No. 9. This Court is unable to determine from the record, however, whether such action remains pending in the state appellate court.

## REQUEST FOR A STAY

Before a federal habeas court may grant relief, a state prisoner must exhaust his available remedies in the state courts. *Castille v. Peoples*, 489 U.S. 346, 349, 380 (1989); *Silverburg v. Evitts,* 993 F.2d 124, 126 (6th Cir.1993). If a habeas petitioner has the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. §2254(b), (c). Moreover, a constitutional claim for relief must be presented to the state's highest court in order to satisfy the exhaustion requirement.

*O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999); *Manning v. Alexander,* 912 F.2d 878, 881 (6th Cir.1990). Where alternative state remedies are available to consider the same claim, exhaustion of one of these remedies is all that is necessary. A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he seeks to present for federal habeas review. *Prather v. Rees,* 822 F.2d 1418, 1420 n. 3 (6th Cir.1987).

Petitioner's claim of ineffective assistance of appellate counsel remains unexhausted. He apparently has now raised this claim in a delayed application to reopen the appeal, which action apparently remains pending in the state appellate court. The United States Supreme Court, however, has held that a stay of proceedings may be appropriate only under limited circumstances. *Rhines v. Weber,* 544 U.S. 269 (2005).

> Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. Cf. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

*Id.,* at 277.

The record fails to reflect either good cause for petitioner's failure, to date, to exhaust state court remedies, or that his claim of ineffective assistance of appellate

counsel is potentially meritorious. *See id.*

In *Pace v. DiGuglielmo,* 125 S.Ct. 1807, 1813 (2005), the Supreme Court stated that

> A petitioner's reasonable confusion about whether a state fil-
> ing would be timely will ordinarily constitute "good cause"
> for him to file in federal court.

*Id.* Other courts have applied differing standards to determine what may constitute

good cause within the meaning of *Rhines v. Weber, supra:*

> Various courts have adopted the standard for cause applic-
> able to procedural defaults which requires that some "objec-
> tive factor external to the defense" made it impossible to
> bring the claim earlier in the state court proceedings as
> required by *Coleman v. Thompson,* 501 U.S. 722, 755, 111 S.Ct.
> 2546, 115 L.Ed.2d 640 (1991). *See e.g., Fernandez v. Artuz* 2006
> WL 121943, *5 (S.D.N.Y., January 18, 2006); *Pierce v. Hurley,*
> 2006 WL 143717, *8 (S.D.Ohio, January 18, 2006); *Carter v.
> Friel,* 2006 WL 208872, *3 (D.Utah, January 6, 2006); *Hernan-
> dez v. Sullivan,* 397 F.Supp.2d 1205, 1207 (C.D.Cal., 2005).
> Others, such as *Jackson v. Roe,* 425 F.3d 654 (9th Cir.2005),
> and the remanded *Rhines v. Weber,* 2005 WL 3466015, *2-3
> (D.S.D., December 19, 2005), conclude that the cause stand-
> ard of *Rhines* requires a lesser showing than that for proced-
> ural default.
>
> In *Jackson v. Roe,* the Ninth Circuit Court of Appeals conclud-
> ed that good cause did not require a showing of "extraordin-
> ary circumstances." The Court said
>
> > [W]e hold that the application of an "extra-
> > ordinary circumstances" standard does not
> > comport with the "good cause" standard pre-
> > scribed by *Rhines. See NLRB v. Zeno Table Co.,*
> > 610 F.2d 567, 569 (9th Cir.1979) (distinguishing
> > between the "good cause" standard found in
> > NLRB regulations and the "extraordinary cir-
> > cumstances" standard in section 10(e) of the
> > National Labor Relations Act and noting that "

> 'good cause' ... appears to be less stringent than
> ... 'extraordinary circumstances' ").

*Jackson*, 425 F.3d at 661-62.

Thus, it would appear that good cause under *Rhines,* at least in [the Ninth] Circuit, should not be so strict a standard as to require a showing of some extreme and unusual event beyond the control of the defendant. This is supported by the Supreme Court's observation in *Pace v. DiGuglielmo,* --- U.S. ----, ---- - ----, 125 S.Ct. 1807, 1813-14, 161 L.Ed.2d 669 (2005), wherein the Court declared that a petitioner's confusion over whether or not his petition would be timely filed was "good cause" for the petitioner to file his unexhausted petition in the federal court.

Another court to discuss the standard of good cause under *Rhines* was the Eastern District of Pennsylvania. That court concluded that the good cause standard falls somewhere between the "lower threshold of unfairness," and the "higher standard of extraordinary circumstances, necessary for equitable tolling in capital cases." *See Baker v. Horn,* 383 F. Supp. 2d 720, 747 (E.D.Pa.2005). This discussion of *Rhines,* while in the context of equitable tolling of a federal challenge in a capital case, examined whether the court should previously have granted a stay of the petition considering the petitioner's particular circumstances and the shifting state of the law in Pennsylvania at the time the original petitioner was filed.

The federal district courts have also developed a split of authority on whether ineffective assistance of post-conviction counsel qualifies as good cause to permit a stay of the federal proceedings. At least five district courts found that alleged ineffective assistance of counsel during post-conviction proceedings did constitute good cause for failure to exhaust claims in state proceedings, most without much discussion of the matter. *See e.g., Rhines v. Weber,* 2005 WL 3466015, *2-3 (D.S.D., December 19, 2005); *Ramchair v. Conway,* 2005 WL 2786975 at *16 (E.D.N.Y., October 26, 2005); *Boyd v. Jones,* 2005 WL 2656639 at *4 (E.D.Mich., October 14,

2005); *Fradiue v. Pliler,* 2005 WL 2204862 at *2 (E.D.Cal., September 8, 2005); and *Martin v. Warren,* 2005 WL 2173365 at *2 (E.D.Mich., September 2, 2005). Similarly at least three district courts found that alleged ineffective assistance of counsel during post-conviction proceedings did not constitute good cause. *See, e.g., Carter v. Friel,* 2006 WL 208872, *3 (D. Utah, January 6, 2006); *Vasquez v. Parrott,* 397 F.Supp.2d 452, 464 (S.D.N.Y., 2005); *Hubbert v. Renico,* 2005 WL 2173612 at *3 (E.D.Mich., September 7, 2005).

Thus, the split of authority is broad and varied. However, the discussions by the Pennsylvania court in *Baker* and the Ninth Circuit in *Jackson* support... [the] conclusion that the good cause standard applicable in consideration of a request for stay and abeyance of a federal habeas petition requires the petitioner to show that he was prevented from raising the claim, either by his own ignorance or confusion about the law or the status of his case, or by circumstances over which he had little or no control, such as the actions of counsel either in contravention of the petitioner's clearly expressed desire to raise the claim or when petitioner had no knowledge of the claim's existence.

*Riner v. Crawford,* 415 F.Supp.2d 1207, 1209-11 (D.Nevada 2006). Nonetheless, the record does not indicate that petitioner can establish good cause for failing to exhaust his claim of ineffective assistance of appellate counsel.

Petitioner states that he has good cause for failing to file a Rule 26(B) application until February 27, 2009 (approximately 1 ½ years after it was due),[2] because he was

[2] Ohio Appellate Rule 26(B)(1) provides:

(1) A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel. An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time.

diagnosed as "seriously mentally ill," takes psychotropic medication, and should not be expected to comprehend and litigate legal issues. *See Reply Memorandum*, Doc. No. 7. However, nothing in the record supports petitioner's allegation that his mental or other physical illness prevented him from filing an application to reopen his appeal until February 2009.[3]  Further, in *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005), the United States Court of Appeals for the Fifth Circuit held that claims are "plainly meritless" for purposes of deciding whether to grant a stay of habeas corpus proceedings where the petitioner is procedurally barred from raising his unexhausted claims in the state courts. Such appear to be the circumstances here.

Therefore, the Magistrate Judge **RECOMMENDS** that petitioner's motion for a stay, Doc. No. 5, be **DENIED.**

### CLAIM ONE

In claim one, petitioner asserts that the evidence was constitutionally insufficient to sustain his convictions on aggravated murder and felonious assault, and that his

---

Here, the appellate court dismissed petitioner's appeal on May 17, 2007.

[3]  As cause for the untimely filing of his Rule 26(B) application, petitioner likewise alleged that he had been diagnosed as "seriously mentally ill."  *See* Doc. No. 9.   In support of this claim, he attached the prison's mental health classifications, indicating that he was classified "mental health level C1" with a "medical level 1." *See id.*  However, nothing therein supports his contention that he was mentally ill and unable to pursue state court relief.  Additionally, portions of the copies of exhibits petitioner attached to his delayed Rule 26(B) application regarding the prison's policy on mental health screening and assessments is not decipherable.  *See id.*

convictions on murder, aggravated murder, and attempted murder are against the manifest weight of the evidence. Petitioner's claim that his convictions are against the manifest weight of the evidence fails to present an issue appropriate for federal habeas corpus relief.

The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir.1983). In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find teach element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses. *Jackson,* 443 U.S. at 319; *Walker,* 703 F.2d at 969.

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence-as opposed to one based upon insufficient evidence-requires the appellate court to act as a "thirteenth juror" and review the entire record, weight the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); cf.

29

*Tibbs v. Florida*, 457 U.S. 31 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that petitioner's conviction was against the manifest weight of the evidence cannot be considered by this Court.

Additionally, petitioner's claim of insufficiency of the evidence lacks merit. Before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia, supra,* 443 U.S. ta 319. To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992)(citing *Jackson*, at 319.) The prosecution is not affirmatively required to "rule out every hypothesis except that of guilty." *Id.* (quoting *Jackson,* at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume-even if it does not appear on the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Id.* (quoting *Jackson*, at 326).

The state appellate court rejected petitioner's claim of insufficiency of the evidence in relevant part as follows:

> [D]efendant only challenges the sufficiency of the evidence
> as it relates to his convictions for aggravated murder (count
> three) and felonious assault (counts eight and ten). In add-
> ition, under his first assignment of error, defendant only
> challenges his convictions for murder, aggravated murder,
> and attempted murder (counts two, three, and six) as alleg-
> edly being against the manifest weight of the evidence.

In determining the sufficiency of the evidence, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386.

\*\*\*

As noted above, defendant challenges the sufficiency of the evidence as to three of his convictions, namely, his aggravated murder and felonious assault convictions. Regarding his aggravated murder conviction, defendant sets forth arguments concerning the issues of whether he planned to kill anyone and whether he in fact personally shot and killed Bonner. Defendant asserts that the evidence demonstrated that Speakman was in possession of the 9-millimeter Ruger that killed Bonner. Defendant also argues that there is no evidence that he planned to kill. He essentially argues that, even if evidence supported a finding that defendant and Speakman planned to rob one of the Shortridges, there is no evidence that defendant planned to kill anyone. In addition, defendant alludes to the theory that was set forth by his counsel at trial that Speakman "went nuts" inside the Shortridge house and shot Bonner.

In this case, the jury found defendant guilty of aggravated murder as alleged in the renumbered count three of the indictment. The renumbered count three of the indictment alleged that defendant, in violation of R.C. 2903.01, purposely caused the death of Russell Bonner, while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit aggravated burglary. As noted by the state, the jury rejected the theory that defendant personally shot Bonner, in view of the verdict as

to the death penalty specification as to count three. However, the evidence in this case supported a finding that defendant, acting with the kind of culpability required for the commission of the offense, aided and abetted in the purposeful shooting of Bonner.

Pursuant to R.C. 2923.03(A), "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense ." "Whoever violates [R.C. 2923.03] is guilty of complicity in the commission of the offense, and shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F). In order to support a conviction for complicity by aiding and abetting under R.C. 2923.03(A)(2), "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson* (2001), 93 Ohio St.3d 240, 2001-Ohio-1336, syllabus. A defendant's " '[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *Johnson*, at 245, quoting *State v. Pruett* (1971), 28 Ohio App.2d 29, 34.

Defendant's presence at the Shortridge house at the time of the shootings was stipulated to by the parties. However, defendant was not simply present at the scene of the shootings. Testimony regarding defendant's conduct and statements before and after the shootings, along with other testimony regarding the circumstances of the shootings, supported a finding that defendant actively participated in the shooting death of Bonner at the Shortridge house, and that he shared the criminal intent of the principal.

Testimony at trial indicated that defendant and Speakman went to the Shortridge house during the evening on July 11, 2004, to purchase drugs and/or to attempt to sell lawnmowers. After they left the Shortridge house, the two went with others to a bar. Later that night, they all drove and parked their vehicles at a church near the Shortridge house.

Evidence at trial indicated that defendant and Speakman, each armed with at least one gun, approached the Shortridge house in the early morning hours of July 12, 2004. Upon arriving at the Shortridge house, defendant pointed his weapon at those on the front porch of the Shortridge house. Shortly thereafter, Clifford, Jr., and Bonner were shot and killed, and Clifford, Sr., was shot and wounded.

Clifford, Sr., testified that defendant shot his weapon to the east of the house, down the hallway, and that, when he confronted defendant, defendant threatened him and then shot him. According to Clifford, Sr., defendant attempted to conceal his face with a bandanna and by lifting his shirt. Additionally, there was testimony that at least two different weapons were fired at the Shortridge house. In that regard, defendant concedes that the evidence at trial, when viewed in a light most favorable to the state, demonstrated that he fired one shot while he was in the house. After the gunfire ceased, defendant and Speakman were seen running from the Shortridge house. They returned to the vehicles, which were parked at the church, and fled the area.

According to Kimberly Repede's testimony, after fleeing the scene of the shootings, defendant fired his weapon and said he "wanted to go out and do more." (Tr. 630.) In addition, before he was arrested, defendant made other statements implicating himself in the shootings. For example, when Kimberly was with detectives who were investigating the shootings, defendant told her that he had already killed two individuals and would kill more if she did not comply with his instructions. Defendant similarly threatened Johnetta Jessee before he was apprehended near the Wind Rush apartment complex.

Considering the evidence presented at trial, we find sufficient evidence showing that defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of aggravated murder, and that defendant shared the criminal intent of the principal in the purposeful killing of Bonner. Thus, the evidence at trial supported the jury's verdict finding defendant guilty of aggra-

vated murder as alleged in count three.

In addition, defendant challenges his felonious assault convictions by arguing that there was insufficient evidence to convict him of those offenses. As pertinent here, R.C. 2903.11(A)(2) prohibits any person from knowingly attempting to cause physical harm to another by means of a deadly weapon. Defendant contends that, although the testimony of the detectives indicates that defendant fired over his shoulder, the testimony also indicated that he did not aim the weapon. Furthermore, defendant notes that the testimony of Detective McDowell indicated that defendant was running at a "high rate of speed" when the shot was fired. (Tr. 974.) According to defendant, he did not aim the weapon, but simply fired a warning shot without any intention of causing physical harm with his weapon.

Although Detective McMillin did testify that defendant did not stop and take aim, the testimony at trial supported a finding that defendant fired the weapon over his shoulder at the pursuing detectives. Indeed, the testimony indicated that he did not stop and take aim because he was in the process of running at a "high rate of speed," or fleeing, from the police. Clearly, the evidence in this case supported a finding that defendant pointed the firearm in the direction of the pursuing officers and fired the weapon. Therefore, we find that the evidence at trial supported the finding that defendant knowingly attempted to cause physical harm to the detectives by means of a deadly weapon. Consequently, we conclude that the evidence was sufficient to support defendant's felonious assault convictions.

... [D]efendant contends that Glenna and Clifford, Sr., lacked any credibility. Defendant argues that Clifford, Sr., lied at trial because he wanted defendant to be convicted for Speakman's actions. Pursuant to that argument, Clifford, Sr., had a motive to lie about seeing defendant shoot him because Speakman, the real shooter, committed suicide and could not be brought to trial for his actions. Defendant challenges Clifford, Sr.'s credibility by citing evidence that the bullet that struck him was fired from a Ruger, which, according to

defendant, was in Speakman's possession. Furthermore, testimony of Martin Scott as to what Clifford, Sr., told him supports the contention that Clifford, Sr., was willing to lie to ensure defendant's conviction. Defendant also argues that Clifford, Sr., lied about his dealings in stolen property and drugs. Consistent with these arguments is defendant's contention that Glenna was untruthful at trial. Defendant, citing Glenna's letters to Scott, asserts that Glenna's denial that she tried to hire Scott to kill defendant was a lie. According to defendant, Glenna's lying supports a finding that he was not the person who shot Clifford, Sr., or Bonner.

"The trier of fact is free to believe all, part, or none of the testimony of each witness who appears before it." *State v. Long* (1998), 127 Ohio App.3d 328, 335. Thus, even if the jury found parts of Clifford, Sr., and/or Glenna's testimony to be untruthful, or inconsistent with the physical evidence, it was within the province of the jury to believe other parts of their testimony and to resolve any evidentiary inconsistencies. In addition, the jury was free to believe other witnesses who testified regarding the circumstances of the shootings and defendant's conduct in relation to those shootings. Based on our review of the evidence, we cannot conclude that the jury clearly lost its way in resolving evidentiary conflicts and created such a manifest miscarriage of justice that defendant's convictions must be reversed and a new trial ordered.

Accordingly, we overrule defendant's first assignment of error. *State v.*

*Morris, supra.* The factual findings of the state appellate court are presumed to be

correct. 28 U.S.C. 2254(e)(1) provides:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was

contrary to or an unreasonable application of clearly established federal law, or based

on an unreasonable determination of the facts in light of the evidence that was present-

ed. 28 U.S.C. 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States District Court for the Western District of Michigan has summarized

this standard as follows:

> [A] decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a con-clusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 413. A state court decision will be deemed an "unreason-able application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state court's adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incor-rectly." *Id.* Further, the federal habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the applica-

tion by the state court was unreasonable. *Id*

*Williams v. Lavigne*, 2006 WL 2524220 (W.D. Michigan August 30, 2006), citing *Williams v. Taylor*, 529 U.S. 362 (2000). Petitioner has failed to meet this standard here.

For the reasons detailed by the state appellate court, this Court likewise concludes that, when viewing all of the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia, supra,* the evidence was constitutionally sufficient to sustain petitioner's convictions.

Claim one is without merit.

## CLAIM TWO

In claim two, petitioner asserts that the trial court's imposition of maximum and consecutive terms of incarceration violated *Blakely v. Washington*, 542 U.S. 296 (2004). Respondent contends that this claim is procedurally defaulted, because petitioner failed to raise the objection at sentencing, and the state appellate court therefore reviewed the claim for plain error only:

> [D]efendant contends that the trial court violated his Sixth Amendment right to a trial by jury by sentencing him to maximum and consecutive sentences, and that this case must be remanded for resentencing.
>
> In support of this constitutional argument, defendant cites Supreme Court of the United States decisions in *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, and *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348. In *Apprendi*, at 490, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Blakely*, at 303, the United States Supreme Court, in applying the rule in *Apprendi,* held that the statutory maximum is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (Emphasis sic.)

On February 27, 2006, and during the pendency of this appeal, the Supreme Court of Ohio released *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856. In *Foster*, the Supreme Court of Ohio, following *Blakely* and *Apprendi,* found portions of Ohio's felony sentencing scheme unconstitutional because those portions required judicial fact-finding in violation of a defendant's Sixth Amendment right to a trial by jury. The *Foster* court severed the unconstitutional provisions from Ohio's felony sentencing laws. Pursuant to *Foster*, "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *Id.* at paragraph seven of the syllabus.

In addition, the *Foster* court concluded that cases pending on direct review "must be remanded to trial courts for new sentencing hearings." *Id*. at ¶ 104. In this regard, this court has recognized the "broad language the Supreme Court of Ohio used in *Foster* when it ordered resentencing for all cases pending on direct review." See State v. Draughon, Franklin App. No. 05AP-860, 2006-Ohio-2445, at ¶ 7. However, this court has also concluded that "a defendant who did not assert a *Blakely* challenge in the trial court waives that challenge and is not entitled to a resentencing hearing based on *Foster." Id.* In other words, "a *Blakely* challenge is waived by a defendant sentenced after *Blakely* if it was not raised in the trial court." *Id.* at ¶ 8.

*Blakely* was decided on June 24, 2004. In the case at bar, defendant's sentencing hearing occurred in August 2005. However, defendant's counsel did not raise error in the trial court on the basis of *Blakely*. Therefore, we conclude that defendant has waived his *Blakely* challenge for purposes of

> this appeal. Furthermore, although defendant has not
> alleged plain error, we note that this court has declined to
> apply the plain error doctrine under these circumstances.
> *See, e.g., State v. Jones*, Franklin App. No. 06AP-734, 2007-
> Ohio-1466. Consequently, we overrule defendant's second
> assignment of error.

*State v. Morris, supra.*

In recognition of the equal obligation of the state courts to protect the constitu-

tional rights of criminal defendants, and in order to prevent needless friction between

the state and federal courts, a state criminal defendant with federal constitutional claims

is required to fairly present those claims to the highest court of the state for considera-

tion. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by

which he may present the claims, his petition is subject to dismissal for failure to

exhaust state remedies. *Id.; Anderson v. Harless,* 459 U.S. 4, 6, (1982) (*per curiam ); Picard

v. Connor,* 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner

can no longer present his claims to a state court, he has also waived them for purposes

of federal habeas review unless he can demonstrate cause for the procedural default

and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*,

477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433

U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state

argues that a federal habeas claim is precluded by the petitioner's failure to observe a

state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court

must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. Id. Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id*.

Under *Maupin*, the procedural rule barring federal habeas corpus review of a petitioner's claim must constitute an adequate and independent state ground upon which to deny relief. To qualify as "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no part on federal law. *See Coleman v. Thompson*, 501 U.S. 722, 732-33(1991). To qualify as "adequate," the state procedural rule must, among other things, be firmly established and regularly followed by the state courts. *Ford v. Georgia*, 498 U.S. 411 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id*. at 423 (quoting *James v. Kentucky*, 466 U.S. 341, 348-351 (1984)); *see also Barr v. City of Columbia*, 378 U.S. 146, 149 (1964); *NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 297 (1964).

The trial court sentenced petitioner on August 25, 2005, in a judgment entry filed on September 14, 2005, *see Exhibit 5 to Return of Writ*, long after the United States Supreme Court's June 24, 2004, decision in *Blakely*, but before the Ohio Supreme Court issued its February 27, 2006, decision in *State v. Foster*, 109 Ohio St.3d 1 (2006)(striking as unconstitutional under *Blakely* portions of Ohio's sentencing statutes that required judicial fact finding). Petitioner filed his appellate brief on April 26, 2006, shortly after the Ohio Supreme Court's decision in *Foster*. *Exhibit 6 to Return of Writ*. The appellate court dismissed his appeal on May 17, 2007. *See State v. Morris, supra*. On October 3, 2007, the Ohio Supreme Court dismissed petitioner's subsequent appeal.

Although the state appellate court refused to consider the merits of petitioner's *Blakely* claim because petitioner failed to object at sentencing, it does not appear that the Ohio courts consistently required such an objection at sentencing to preserve a *Blakely* error for appellate review, at least at the time of petitioner's appeal and in regard to defendants, like petitioner, who were sentenced after *Blakely*, but whose case remained pending on appeal at the time *Foster* was decided.

In *Foster*, the Ohio Supreme Court remanded all cases then pending on direct review. *State v. Foster, supra*, 109 Ohio St.3d at 31. But the issue of whether a defendant had to make a contemporaneous objection that his sentence violated *Blakely* was not before the Supreme Court in *Foster* and was not addressed. Following *Blakely*, the Ohio appellate courts were divided on whether a failure to raise a *Blakely* objection at sentencing precluded appellate review of that claim. For example, the Ohio Seventh District

Court of Appeals in *State v. Scranton Buchanan,* 2006 WL 3059911 (Ohio App. 7th Dist.

October 26, 2006), declined to adopt that rule as follows:

> [T]he Ninth and Tenth Appellate Districts have found that
> Foster issues in some situations are waived if they are not
> raised to the trial court. *State v. Silverman*, 10th Dist. Nos.
> 05AP-837, 05AP-838, 05AP839, 2006-Ohio-3826, ¶ 139-141;
> *State v. Jones*, 9th Dist. No. 22811, 2006-Ohio-1820. The Sixth
> Appellate District, however, has determined that the prin-
> ciples of waiver are inapplicable in the *Foster* analysis. *State
> v. Brinkman*, 6th Dist. No. WD-05-058, 2006-Ohio-3868, 168
> Ohio App.3d 245, 859 N.E.2d 595. The situations in which
> these districts are addressing waiver are where the defend-
> ant was sentenced after *Blakely* was decided and failed to
> raise *Blakely* and it principles to the sentencing court. The
> matter at hand is one of those situations. *Buchanan* was
> sentenced post- *Blakely* and the record is devoid of any
> indication that Buchanan raised any *Blakely* issue with the
> sentencing court. Accordingly, we must determine whether
> the principles of waiver are applicable in this situation.
>
> The Ohio Supreme Court addressed waiver in the *Foster*
> opinion. However, the defendants in Foster were sentenced
> pre-*Blakely*. The *Foster* holding clearly indicates that if a
> defendant had been sentenced prior to the decision in *Blakely*
> and does not make an argument about the potential uncon-
> stitutionality of Ohio's felony sentencing scheme, the argu-
> ment is not waived. *Foster*, at ¶ 30-33, 845 N.E.2d 470. How-
> ever, *Foster* does not speak to the situation where a defend-
> ant was sentenced after *Blakely* was decided and failed to
> raise issues concerning *Blakely* and Ohio's felony sentencing
> scheme.
>
> As stated above, the Ninth and Tenth Appellate Districts
> have stated that defendants sentenced post *Blakely* and did
> not raise *Blakely* to the sentencing court have waived any
> such argument. These courts have explained:
>
> "In *State v. Draughon*, Franklin App. No. 05AP-860, 2006-
> Ohio-2445, at ¶ 7, we acknowledged the 'broad language the

Supreme Court of Ohio used in *Foster* when it ordered re-sentencing for all cases pending on direct review.' However, we concluded that 'a defendant who did not assert a *Blakely* challenge in the trial court waives that challenge and is not entitled to a resentencing hearing based on *Foster.' Id.* In concluding as such, we 'consider[ed] the language used in *United States v. Booker* (2005), 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, the case that *Foster* relied on in arriving at' its decision to sever the unconstitutional statutes from Ohio's felony sentencing laws. *Id.* 'In *Booker,* the United States Supreme Court applied *Blakely* to the Federal Sentencing Guidelines.' *Id.* 'The *Booker* Court applied its holding to all cases on direct review.' *Id.* However, the *Booker* court 'expected reviewing courts to apply "ordinary prudential doctrines," such as waiver * * * to determine whether to remand a case for a new sentencing.' *Id.,* quoting *Booker* at 268. 'Thus, in accordance with the well-settled doctrine of waiver of constitutional challenges, and the language in *Booker,'* we held in *Draughon* that a '*Blakely* challenge is waived by a defendant sentenced after *Blakely* if it was not raised in the trial court.' *Draughon* at ¶ 8.

"Here, the trial court sentenced appellant after the United States Supreme Court issued *Blakely.* Thus, appellant could have objected to his sentencing based on *Blakely* and the constitutionality of Ohio's sentencing scheme. Appellant did not do so. Therefore, pursuant to *Draughon,* we conclude that appellant waived his *Blakely* argument on appeal. *See Draughon* at ¶ 7.

"Accordingly, based on the above, we need not reverse appellant's prison sentences on Eighth Amendment or *Blakely* grounds. As such, we overrule appellant's second and third assignments of error." *State v. Silverman*, 10th Dist. Nos. 05AP-837, 05AP-838, 05AP839, 2006-Ohio-3826, ¶ 139-141. See, also, *State v. Jones,* 9th Dist. No. 22811, 2006-Ohio-1820.

On the other hand, the Sixth Appellate District has taken the opposite view. *State v. Brinkman*, 6th Dist. No. WD-05-058, 2006-Ohio-3868, 168 Ohio App.3d 245, 859 N.E.2d 595. It

explained:

> "The state responds that appellant is not entitled to be resentenced because he failed to raise the *Blakely* issue at his sentencing hearing. Citing *State v. Murphy*, 91 Ohio St.3d 516, 532, 747 N.E.2d 765, 2001-Ohio-112, the state observes that the failure of a party to interject a contemporaneous objection to error, even constitutional error, waives further consideration. The state insists that such should be the fate of a *Blakely* objection. "We find this argument to be inconsistent with *Foster,* which clearly directs that, ' * * * those [cases] pending on direct review must be remanded to trial courts for new sentencing hearings * * *.' *Foster at ¶* 104; *State v. Mota*, 6th Dist. No. L-04-1354, 2006-Ohio-3800. Consequently, appellant's third assignment of error is well-taken." *Id.* at ¶ 30-31.
>
> In making such a holding, the Sixth Appellate District acknowledged that its decision was in conflict with the Ninth and Tenth Appellate Districts. As such, it certified a conflict to the Ohio Supreme Court on July 28, 2006.
>
> After reviewing our sister districts' analysis on the issue, we tend to agree with the Sixth Appellate District. We agree that the principles of waiver do not apply to *Foster*.

*Id.*

The Ohio Supreme Court resolved this conflict in *State v. Payne*, 114 Ohio St.3d 502, 506 (2007), holding that a defendant sentenced after *Blakely* who failed to raise the objection at sentencing forfeited the error for appellate review. The defendant in *Payne* was in the same circumstances as petitioner Morris. He was sentenced after *Blakely* but made no *Blakely* objection at sentencing. His appeal was pending when *Foster* was decided.

The Supreme Court of Ohio acknowledged in *Payne* that it remanded a number of

cases on its docket that raised *Blakely* issues without addressing whether Ohio's

contemporaneous objection rule barred appellate review:

> In *Foster* and similar appellate cases,[1] we remanded a large number of **309 cases already in the appellate phase for resentencing hearings without any mention of forfeiture. *Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 3-7. The remand orders were silent as to the issue currently confronting us.

> ————
>
> 1   See, *e.g.*, In re Ohio Criminal Sentencing Statutes Cases, 110 Ohio St.3d 264, 2006-Ohio-4475, 853 N.E.2d 274, ¶ 2-3; In re Ohio Criminal Sentencing Statutes Cases, 110 Ohio St.3d 156, 2006-Ohio-4086, 852 N.E.2d 156, ¶ 3-7; In re Ohio Criminal Sentencing Statutes Cases, 110 Ohio St.3d 70, 2006-Ohio-3663, 850 N.E.2d 1168, ¶ 2-10; In re Ohio Criminal Sentencing Statutes Cases, 109 Ohio St.3d 518, 2006-Ohio-3254, 849 N.E.2d 985, ¶ 2-9; In re Ohio Criminal Sentencing Statutes Cases, 109 Ohio St.3d 509, 2006-Ohio-2721, 849 N.E.2d 284, ¶ 2-10; In re Ohio Criminal Sentencing Statutes Cases, 109 Ohio St.3d 411, 2006-Ohio-2394, 848 N.E.2d 809, ¶ 2-19; In re Ohio Criminal Sentencing Statutes Cases, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174, ¶ 2-252.

> ————
>
> We recognize that this court remanded for resentencing some cases in which the initial sentencing by the trial court had occurred after Blakely was decided, but where the defendant had seemingly failed to object on Blakely grounds to the sentence imposed. See, e.g., *State v. Kendrick*, 2d Dist. No. 20965, 2006-Ohio-311, 2006 WL 202141,judgment reversed by *In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 411, 2006-Ohio-2394, 848 N.E.2d 809, ¶ 19. However, this court did not then definitively resolve the issue presented by this case; thus, it is appropriate to do so now.

114 Ohio State 3d at 504. The Supreme Court of Ohio stated that the courts holding that

*Foster* stood for the proposition that *Blakely* error was not waived by a failure to make a

contemporaneous objection

overlooked our holding that "[a] reported decision, although a case where the question might have been raised, is entitled to no consideration whatever as settling * * * a question not passed upon or raised at the time of the adjudication." *State ex rel. Gordon v. Rhodes* (1952), 158 Ohio St. 129, 48 O.O. 64, 107 N.E.2d 206, paragraph one of the syllabus.

Thus, we are not bound by any perceived implications that may have been inferred from *Foster. Cf. Lopez v. Monterey Cty.* (1999), 525 U.S. 266, 281, 119 S.Ct. 693, 142 L.Ed.2d 728; *see, also, State ex rel. United Auto., Aerospace & Agricultural Implement Workers of Am. v. Bur. of Workers' Comp.*, 108 Ohio St.3d 432, 2006-Ohio-1327, 844 N.E.2d 335, ¶ 46.

*Id.* The Supreme Court of Ohio then, following the holding in *Booker,* concluded that a

failure to object at sentencing waived *Blakely* error:

We are guided by *United States v. Booker* (2005), 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621. *Booker*, like *Foster*, applied to every case that was in the appellate stage. Id. at 268, 125 S.Ct. 738, 160 L.Ed.2d 621. The United States Supreme Court, however, noted that not every case would be entitled to a resentencing hearing. Instead, *Booker* instructed courts "to apply ordinary *505 prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test." Id.

Because *Blakely* was announced prior to Payne's plea and sentence, and because we conclude that the error is not structural, in failing to make a *Blakely* objection, Payne forfeited the issue for appellate purposes.

114 Ohio State 3d at 504-05, 506.

While the Ohio intermediate appellate courts were divided about whether

defendants who first raised a *Blakely* argument on direct appeal and whose cases were

pending when *Foster* was announced, Ohio has a long-standing inconsistently enforced

contemporaneous objection rule. *Osborne v. Ohio,* 495 U.S. 103, 124 (1990); *Engle v. Isaac,*

456 U.S. 107, 124-25 (1982); *State v. Underwood,* 3 Ohio State 3d 12 (1982); *State v. Durkin,*

66 Ohio St. 2d 158, 161 (1981); *State v. Wade*, 53 Ohio St. 2d 182, 186 (1978); *State v. Wallen*, 25 Ohio St. 2d 45, 46 (1971). The Ohio appellate Court's confusion about how to read the *Foster* remand does not undermine that fact that Ohio has consistently enforced its contemporaneous objection rule. Neither Morris nor any other defendant could have been misled about the necessity of raising an objection to a sentencing error during the sentencing proceeding. Consequently, respondent has demonstrated that petitioner Morris has waived his *Blakely* claim. Petitioner has failed to demonstrate cause for that waiver; therefore, Claim Two is procedurally barred.

## CLAIM THREE

In claim three, petitioner asserts that he was denied a fair trial because the trial court issued a jury instruction on flight that improperly shifted the burden to petitioner to explain the flight. If he did not, his guilt could be inferred from the flight. Petitioner asserts that this jury instruction therefore violated his right not to testify. The state appellate court rejected this claim as follows:

> Defendant argues in his third assignment of error that the trial court gave an improper jury instruction on the issue of defendant's flight. Defendant argues that the jury instruction required him to testify in violation of his Fifth and Fourteenth Amendment rights under the United States Constitution and in violation of his right against self-incrimination as guaranteed by Section 10, Article 1, of the Ohio Constitution. The state argues that the trial court properly instructed the jury.

>> "When determining whether a trial court erred in its jury instructions, an appellate court reviews the instruction as a whole. * * * A trial court has broad discretion in instructing the jury." (Citations omitted.) *State v. Orlandi*, Franklin App.

No. 05AP-917, 2006-Ohio-6039, at ¶ 31. The jury is presumed to follow instructions given by the court. *State v. Pena,* Franklin App. No. 03AP-174, 2004-Ohio-350, at ¶ 27, citing *Pang v. Minch* (1990), 53 Ohio St.3d 186, paragraph four of the syllabus.

As to defendant's flight, the court instructed the jury as follows:

In this case, there is evidence tending to indicate that the defendant fled from the vicinity of the alleged crime. In this case, you are instructed that flight in and of itself does not raise a presumption of guilt. However, unless satisfactorily explained, it tends to show a consciousness of guilt or a guilty connection with the alleged crime. If, therefore, you find the defendant did flee from the vicinity of the alleged crime and this conduct has not been satisfactorily explained, you may consider the circumstances in the case in determining the guilt or innocence of the defendant. Upon you alone rests the decision to determine that weight, if any, you place upon the evidence you find, if any, which bears upon this issue.

(Emphasis added.) (Tr. 1375.) The trial court also instructed the jury as follows: "It is not necessary that the defendant take the witness stand in his own defense. The defendant has a constitutional right not to testify. The fact that the defendant did not testify must not be considered for any purpose." (Tr. 1347.)

In support of his argument that the instruction on flight violated his constitutional rights, defendant cites the Comment to § 405.25 of the Ohio Jury Instructions ("OJI"), which states as follows:

 Courts in Ohio have held that requiring the defendant to provide an explanation of the conduct by including in the instruction the phrase "unless satisfactorily explained" is unconstitutional and wrongfully places a burden upon the defendant. *State v. Berry*, Cuyahoga App. No. 83756, 2004-Ohio-5485; *State v. Davilla,* Lorain App. No. 03CA008413, 2004-Ohio-4448; *State v. Williams* (Mar. 10, 1997), 5th Dist.

48

No.1995CA00262; *State v. Fields* (1973), 35 Ohio App.2d 140.

Additionally, defendant relies upon *State v. Fields* (1973), 35 Ohio App.2d 140, *State v. Taylor*, 78 Ohio St .3d 15, 1997-Ohio-243, *State v. Williams* (Dec. 17, 1992), Cuyahoga App. No. 61262 ("Johnny Williams"), and *State v. Williams* (Mar. 10, 1997), Stark App. No.1995CA00262 ("Ron Williams"), in support of his contention that the inclusion of the phrase "unless satisfactorily explained" in a jury instruction on the issue of flight is unconstitutional if the defendant does not testify. Defendant's reliance upon the comment to the OJI and the above-cited cases is unavailing.

At issue in *Fields* was the following jury instruction:

"Now, in this case, there is evidence tending to indicate that both of the defendants fled from the vicinity of the alleged crime. In this connection, you are instructed that flight in and of itself does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show consciousness of guilt or a guilty connection with the crime. If, therefore, you find that one or both of the defendants did flee from the scene of the alleged crime, and one or both have not satisfactorily explained their conduct in so doing, you may consider this circumstance together with all other facts and circumstances in the case in determining the guilt or innocence of one or both of the defendants."

(Emphasis added.; *Id*. at 144-145.)

The *Fields* court held that the jury instruction "unlawfully compromise[d]" the defendant's right "under the Fifth and Fourteenth Amendments of the United States Constitution to remain silent and, further, not to have that silence converted into evidence against him." *Id*. at 145. The Fields court reasoned as follows:

It is apparent from an examination of the above instruction that it may, and almost certainly will, be understood to require a defendant, himself, to "satisfactorily explain" his

49

conduct in fleeing the scene of a crime, and a conscientious juror, intent upon following the law as the court gives it to him, will consequently construe the continuing silence of a defendant as a failure to so satisfactorily explain his conduct in [fleeing] the scene and, therefore, is to be considered by him as a "circumstance together with all the other facts and circumstances in the case in determining the guilt or innocence" of the defendant.

Nor does it cure the defect of this charge to point out, as the state argues, that a defendant may meet this test by a satisfactory explanation of his flight through someone other than himself, while preserving his own right to remain silent. Unfortunately, this is not the only, or even the plain meaning of the charge. The plain meaning is that the defendant shall explain the circumstance, not someone else. If there is another subtler reading of the words, we cannot depend upon or require the jury to make it.

*Id.* at 145-146.

Initially, we note that the instruction on flight in the *Fields* case was slightly different than the one given in this case. In *Fields,* the reference to whether the flight had been explained was not entirely in the passive voice, and the instruction specifically refers to the defendant as the person who must explain his actions. In this regard, the pertinent portion of the instruction in *Fields* provided: "If, therefore, you find that one or both of the defendants did flee from the scene of the alleged crime, and one or both have not satisfactorily explained their conduct in so doing, you may consider this circumstance together with all other facts and circumstances in the case in determining the guilt or innocence of one or both of the defendants." (Emphasis added.) Here, the jury was instructed that if it found the "defendant did flee from the vicinity of the alleged crime and this conduct has not been satisfactorily explained, you may consider the circumstances in the case in determining the guilt or innocence of the defendant." (Emphasis added.)

Additionally, the *Fields* decision provides no indication as to

whether the trial court instructed the jury regarding defendant's right not to testify. Defendant argues that nothing indicates that the jury instruction in *Fields* did not also include the "standard jury" instruction on the defendant's right to remain silent. (Defendant's supplemental brief, at 4.) However, unlike defendant in his appellate brief, we do not presume that such an instruction was given in *Fields*, a case from the early 1970s. In *State v. Nelson* (1973), 36 Ohio St.2d 79, the Supreme Court of Ohio held that it was discretionary with the trial judge whether to instruct the jury on the defendant's rights to elect not to testify. *Id.* at paragraph three of the syllabus. That holding was subsequently overruled in *State v. Fanning* (1982), 1 Ohio St.3d 19, wherein the court held that a defendant has a right, if properly requested, to have the trial court instruct the jury that his failure to testify cannot be considered for any purpose. *Id.* at paragraph one of the syllabus. Nonetheless, it is uncertain whether such an instruction was given in *Fields*. Furthermore, even if the instruction was given in the *Fields* case, the *Fields* court did not analyze the instruction's possible impact on the portion of the jury instructions that it found unconstitutional.

In *Taylor, supra*, the Supreme Court of Ohio addressed the defendant's argument that the trial court erred in instructing the jury, over his objection, that "flight, in and of itself, does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show consciousness of guilt or a guilty connection with the crime." *Taylor,* at 27. In resolving that argument, the court found that the instruction on flight was neither arbitrary nor unreasonable and did not create an improper mandatory presumption. *Id.* It further determined that the instruction did not "improperly comment on [the defendant's] silence, since he testified." *Id., citing Fields.* In the case at bar, defendant reasons that it would be a logical extension of *Taylor* to conclude that the inclusion of the "unless satisfactorily explained" phrase is improper when the defendant does not testify. However, in *Taylor,* the defendant did testify. Thus, the Supreme Court of Ohio did not analyze whether the use of the "unless satisfactorily explained" language would be improper if the defendant did not testify, even though the trial court instructs the jury that the defendant's

decision not to testify cannot be considered for any purpose. Furthermore, we do not view the *Taylor* court's citation to the Fields case as resolving the issue found in the case at bar. Therefore, we decline to extend *Taylor* to resolve the issue found in this case.

The *Johnny Williams* court relied upon *Fields* in determining that the defendant was prejudiced by the jury instruction that was given on the issue of flight. However, the *Johnny Williams* court did not analyze the possible significance of an instruction that defendant's silence could not be used for any purpose. In addition, in the *Johnny Williams* case, a portion of the jury instruction on the issue of flight stated, "If, therefore, you find that the Defendant did flee from the scene of the alleged crime and has not satisfactorily explained his conduct in the statement, you may consider this circumstance[.]" (Emphasis added.) *Id.*

In the *Ron Williams* case, the defendant argued that the trial court failed to instruct the jury to consider his testimony explaining his apparent flight. In resolving the issue, the court stated:

Courts in Ohio have universally held that including the phrase "unless satisfactorily explained" is unconstitutional, as it wrongfully places a burden upon the defendant and violates the defendant's right to remain silent under the Fifth and Fourteenth Amendments of the United States Constitution.

* * *

*Id.*, citing *Fields; State v. Harris* (Apr. 10, 1986), Cuyahoga App. No. 50117; *State v. Hagwood* (June 2, 1995), Lake App. No. 94-L-016. On that basis, the court concluded that the trial court did not abuse its discretion by not instructing the jury on the issue of flight as requested by the defendant. *Id.* As in the Johnny Williams decision, the Ron Williams decision did not analyze the possible significance of an instruction that defendant's silence could not be used for any purpose.

Although the cases cited by defendant do not analyze the issue presented in this case, other cases have resolved this issue. In *State v. Brady,* Summit App. No. 22034, 2005-Ohio-593, the trial court instructed the jury on the issue of flight in virtually the same manner as the trial court in this case instructed the jury on that issue. *See Brady, at* ¶ 6. In *Brady*, the defendant argued that the instruction on flight improperly placed the burden of proof on him and that the trial court allowed his silence to be used as evidence against him in violation of his constitutional right to remain silent. *See Id.* at ¶ 4. As in this case, the defendant relied upon Fields as support for his position. The Ninth District Court of Appeals in *Brady* disagreed with the defendant's contention, and it found his reliance upon Fields to be unavailing because the instruction in *Fields* was distinguishable. *See Id.* at ¶ 4, 8. The *Brady* court determined that the instruction did not direct defendant to personally explain the circumstances of his flight, and that the jury was instructed that the defendant's silence was not to be used against him. *See Id.* at ¶ 9. The *Brady* court concluded: "Under these circumstances, we do not find that Defendant's constitutional rights were violated." Id. at ¶ 9.

Furthermore, the Sixth District Court of Appeals in *State v. Pitts* (Sept. 30, 1997), Lucas App. No. L-96-259, resolved that the following instruction was not unconstitutional, even though the defendant did not testify:

"In this case, there is evidence tending to indicate that the defendant fled or attempted to flee from the vicinity of the alleged crime. You are instructed that flight in and of itself does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show consciousness of guilt or some guilty connection to the crime. If, therefore, you find that the defendant did flee or attempted to flee from the scene of the alleged crime and that no satisfactory explanation has been offered for his conduct, you may consider this circumstance in determining the guilt or innocence of the defendant."

(Emphasis added.)

The *Pitt* court reasoned that because the instruction did not direct appellant to personally explain his flight, and because the trial court instructed the jury that the defendant's silence was not to be used against him, the instruction was not unconstitutional.

We agree with the reasoning applied in *Brady,* as well as *Pitts,* regarding the use of the "unless satisfactorily explained" language in jury instructions on the issue of a defendant's flight. When the jury instruction in this case is viewed in its entirety, it did not direct defendant to personally explain the apparent flight, and the jury was specifically instructed to not use defendant's silence for any purpose. Because the "unless satisfactorily explained" language is in the passive voice and no actor is specified, one is left to speculate as to who may reasonably provide the explanation, if that language is viewed in isolation. However, when the entirety of the jury instruction is considered, a conscientious juror would abide by the instruction that defendant's silence cannot be used for any purpose. It is presumed that the jury followed the court's instructions. Thus, to the extent the instruction on flight suggested that defendant was required to personally explain his apparent flight, that suggestion was abated by the court's instruction regarding defendant's right not to testify and the fact that defendant did not testify could not be used for any purpose. Therefore, the jury instructions, considered as a whole, did not require defendant to personally explain his actions, nor did the instructions create an improper mandatory presumption.

Based on the foregoing, we find the *Brady* and *Pitts* decisions instructive in this case, and we conclude that the trial court did not improperly instruct the jury on the issue of defendant's flight. Consequently, we overrule defendant's third assignment of error.

*State v. Morris, supra.* Again, the findings of the state appellate court are presumed to be correct. 28 U.S.C. 2254(e). Petitioner has failed to establish that the state appellate court's is unreasonable so as to warrant federal habeas corpus relief. 28 U.S.C. 2254(d);

*Williams v. Taylor, supra.*

Errors in jury instructions are generally not cognizable in federal habeas corpus unless they deprive petitioner of a fundamentally fair trial. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *see also Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *Thomas v. Arn,* 704 F.2d 865, 868-69 (6th Cir. 1983). A habeas petitioner challenging jury instructions must establish that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Such are not the circumstances here. The United States Court of Appeals for the Sixth Circuit, in an unpublished decision, *Drake v. Superintendent, Trumbull Correctional Inst.*, 106 F.3d 400, unpublished, 1997 WL 14422 (6th Cir. January 14, 1997), rejected the argument that instructing the jury that flight, "unless satisfactorily explained... tends to show consciousness of guilt or a guilty connection with the alleged crime" and may be considered in determining guilt improperly shifts the burden of proof to the defendant in a criminal case, stating:

> This instruction is constitutionally sound; it unambiguously states that flight, in and of itself, does not raise a presumption of guilt. The instruction clearly communicates that the jury "may" consider unexplained flight in determining guilt or innocence but is not required to do so. The jury is still free to disregard any evidence of flight in determining guilt. The instruction is consistent with Ohio law, in that a jury may consider flight as indicative of consciousness of guilt.

*Id.*, at *7; *see also Taylor v. Mitchell*, 296 F.Supp.2d 784 (N.D. Ohio 2003), *declined to follow on other grounds by Williams v. Anderson,* 460 F.3d 789 (6th Cir. 2006).

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that petitioner's motion for a stay be **DENIED**; and that the petition for writ of habeas corpus be **DENIED**.

Petitioner's motion to compel a ruling on his request for a stay, Doc. No. 10, is **DENIED,** as moot. Petitioner's motion to strike, Doc. No. 11, is **DENIED**.

If any party objects to this *Report and Recommendation,* that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation* de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

s/Mark R. Abel
United States Magistrate Judge